UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ALEJANDRO EDUARDO
DELGADO DE ARMAS,

          Petitioner,

    v.

WARDEN OF FLORIDA SOFT
SIDE SOUTH FACILITY, KELIE
WALKER,

          Respondents,

Case No. 2:26-cv-792-KCD-DNF

/

## <u>ORDER</u>

Petitioner Alejandro Eduardo Delgado De Armas is a Cuban national who arrived in the United States in 1980 as part of the Mariel boatlift. (Doc. 1 at 1.)[1] He was initially granted parole but lost that status after criminal convictions for possession of a weapon and drug trafficking. To date, Petitioner has spent more than a decade in prison. (*See* Doc. 12 at 2.)

An immigration judge ordered Petitioner's removal in 1998. (Doc. 1 at 2.) But because the Government could not effectuate his return to Cuba due to diplomatic barriers, U.S. Immigration and Customs Enforcement ("ICE") released him on an order of supervision. (Doc. 1-5.) On November 19, 2025, ICE revoked his supervision and detained him to execute the long-standing

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

removal order.  (Doc. 12-3.) ICE also provided Petitioner with notice of intent to remove him to Mexico. (Doc. 12-4.) On February 19, ICE made good on that notice, but according to the unrebutted record, Petitioner refused to cooperate. (Doc. 22-1.) This habeas case followed.

Petitioner is challenging the legality of his continued immigration detention. He mounts a multi-pronged attack. First, he argues that his "unexplained and sudden re-detention transforms a civil regulatory scheme into punitive confinement, which the Fifth Amendment forbids." (Doc. 1 at 30.) Second, the Government violated his procedural due process rights by revoking his liberty without prior notice, an explanation, or a meaningful opportunity to be heard. (*Id.* at 30-31.) Third, he invokes the *Accardi* doctrine, contending that his detention is unlawful because ICE completely ignored its own binding regulations governing the revocation of release for Mariel Cubans. (*Id.* at 27.) Finally, he asserts that his detention violates the Immigration and Nationality Act ("INA") because the state-run facility holding him lacks the proper statutory authority and federal contracts to operate as an immigration detention center. (*Id.* at 32-34.)

The Government responds that Petitioner's detention is legally sound because he is subject to a final removal order, he has thwarted the deportation process, and ICE otherwise complied with its regulatory obligations. (Doc. 12 at 14-25.)

2

## I. Legal Standard

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or law or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

## II. Discussion

Petitioner's claims are addressed in turn.

### Count I—Substantive Due Process

The Fifth Amendment protects noncitizens during deportation proceedings. At the same time, however, "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). "[T]he through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Dep't of State v. Munoz*, 602 U.S. 899, 911-12 (2024). "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would

be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976).

Because immigration detention is a civil tool rather than a criminal penalty, the constitutional line is generally drawn at punishment. *See Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir. 1981). By contrast, the Government can lawfully hold a noncitizen to ensure they are present for removal or to keep the public safe. That is simply the machinery of the immigration system doing its job. A substantive due process violation happens only when that machinery breaks down—when the detention loses its reasonable connection to effectuating a removal order and morphs into a penalty. *Cf. Lee v. Stone*, No. 2:11-CV-00014-RWS, 2011 WL 4553147, at *7 (N.D. Ga. Aug. 25, 2011). So long as the custody serves a legitimate immigration purpose rather than acting as a punitive measure, it stays on the right side of the Constitution. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 747 (1987); *Rodriguez v. Perry*, 747 F. Supp. 3d 911, 917 (E.D. Va. 2024) ("[A]liens . . . have a substantive due process right to be free of arbitrary confinement pending deportation proceedings.").

Petitioner cannot show that his current stint in custody is a punishment masquerading as immigration processing or is otherwise arbitrary. He is subject to a final removal order that stands uncontested. The INA explicitly authorizes a return to detention to effectuate such orders. 8

C.F.R. § 241.13(i)(2). And the government no doubt has a legitimate interest in doing exactly that—enforcing its laws, ensuring individuals do not flee, and protecting the public. *See Malam v. Adducci*, 469 F. Supp. 3d 767, 790 (E.D. Mich. 2020). Here, the Government revoked Petitioner's release specifically to enforce his outstanding removal order. Returning him to custody thus serves a recognized, legitimate government objective.

Nor is Petitioner being held beyond what the Constitution allows. When a noncitizen's removal order becomes final, like here, the government has 90 days to effectuate removal. 8 U.S.C. § 1231(a)(1)(A). During that period, detention is mandatory. *Id.* § 1231(a)(2)(A). If the 90 days pass and the noncitizen is still here, the statute gives the government a choice: release the individual on supervision or keep them detained. *Id.* § 1231(a)(6).

But as the Supreme Court explained in *Zadvydas v. Davis*, the authority to detain does not stretch into infinity. To avoid serious constitutional problems, the Court read an implicit limitation into the statute: the government may detain a noncitizen only for a period "reasonably necessary" to secure his removal. 533 U.S. 678 (2001). And to make that rule workable, the Court established a presumption. For the first six months, detention is presumptively reasonable. *Id.* at 701. After that period has passed and the alien "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the

5

burden then shifts to the government to provide evidence sufficient to rebut that showing. *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002). Thus, "in order to state a claim under *Zadvydas*, the alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

ICE took Petitioner into custody on November 19, 2025, which is beyond six months. But according to the unrebutted record, he has since refused removal to Mexico. (Doc. 22-1.) Such conduct tolls the detention period. *See Akinwale*, 287 F.3d at 1052 n.4 (stating that "removal period shall be extended ... if the alien ... acts to prevent the alien's removal subject to an order of removal").

Under 8 U.S.C. § 1231(a)(1)(C), the removal clock stops ticking if an alien refuses to cooperate in obtaining travel documents. It also tolls if the alien "conspires or acts to prevent [his] removal." *Id.* Common sense (and the Eleventh Circuit) tells us that a person cannot actively thwart his own deportation and then use the resulting delay to demand his freedom. Whether by stubbornly withholding a signature on a required form or by affirmatively taking steps to sabotage the government's efforts, an alien who engineers his own prolonged detention cannot turn around and complain about it. The law does not reward that kind of gamesmanship. *See Guo Xing*

*Song v. U.S. Atty. Gen.*, 516 F. App'x 894, 899 (11th Cir. 2013) ("The six-month period is tolled, however, if the alien acts to prevent his removal.").

That is precisely the game Petitioner is playing here. He does not deny that he physically prevented extradition at the border. He has likewise refused to sign the notice of removal to Mexico. *See E.D.Q.C. v. Warden, Stewart Det. Ctr.*, 789 F. Supp. 3d 1234, 1240 (M.D. Ga. 2025) ("The INA allows for third-country removals, including removal to another country whose government will accept the alien into that country."). The Immigration and Nationality Act does not leave an individual without recourse if he objects to his designated destination. The statute provides a mechanism for contesting removal to a specific third country. *See* 8 U.S.C. § 1231(b). But nowhere does Petitioner allege—let alone offer evidence to show—that he has formally challenged his proposed removal to Mexico. Instead, he has apparently dug in his heels and refused to physically cooperate. Because it seems he bypassed the proper legal channels for contesting his destination, this Court must accept he is legally subject to removal to Mexico.

Petitioner claims his detention violates the Fifth Amendment, yet his refusal to cooperate with ICE is the very roadblock keeping him in custody. If he signs the paperwork and gets off the bus, his removal is reasonably foreseeable; if he does not, the delay is entirely of his own making. Because Petitioner is apparently responsible for stalling his own departure, the

7

presumptively reasonable period for his detention is tolled. *Vaz v. Skinner*, 634 F. App'x 778, 782 (11th Cir. 2015).

When the Government holds a noncitizen to execute a valid removal order, it is not doling out an unconstitutional penalty. It is simply doing what the regulatory scheme authorizes. Because Petitioner has impeded his removal, his confinement remains tethered to a legitimate, civil immigration purpose. His substantive due process claim thus fails. *See H.N. v. Warden, Stewart Det. Ctr.*, No. 7:21-CV-59-HL-MSH, 2021 WL 4203232, at *3 (M.D. Ga. Sept. 15, 2021).

**Count II—Procedural Due Process**

Petitioner next challenges the procedural mechanics of his re-detention. (Doc. 1 at 30-31.) He claims that ICE's decision to revoke his supervision violated the Fifth Amendment's guarantee of procedural due process. The Court cannot agree. To understand why, start with the baseline reality of Petitioner's legal status. He is a noncitizen subject to a final, unexecuted order of removal who has been convicted of several felonies. His release on supervision was a matter of administrative grace born of logistical necessity, not a permanent constitutional entitlement. When the Government determines that circumstances have changed and it is finally time to carry out its removal order, the Constitution does not demand a full-dress, pre-deprivation trial. Due process, as the Supreme Court has often reminded us,

is flexible. It "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

In the context of revoking a noncitizen's supervised release and detaining him, like here, ICE's regulations strike that constitutional balance by guaranteeing written notice and an informal interview that allows the individual to respond. *See* 8 C.F.R. §§ 241.4(l)(1), 241.13(i). These guardrails are undoubtedly sufficient considering the interests at play. And Petitioner offers no authority to the contrary. *See Valdes-Santovenia v. Ripa*, No. 2:25-CV-01063-JES-DNF, 2025 WL 3771264, at *3 (M.D. Fla. Dec. 31, 2025); *cf. Daniels v. Tampa Police Dep't*, No. 8:25-CV-01529-WFJ-AEP, 2025 WL 2959658, at *3 (M.D. Fla. Oct. 20, 2025) ("[P]rocedural due process guarantees fair procedure and requires notice and an opportunity to be heard before any governmental deprivation of a [constitutionally-protected] interest.").

According to the Government's evidence, which stands unrebutted, Petitioner apparently got exactly what the Fifth Amendment requires in this context—notice and a meaningful opportunity to respond. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). And any arguments about the sufficiency of the notice are rejected for the reasons previously explained by this Court. *See Tran v. Warden, Fla. Soft Side S. Det. Ctr.*, No. 2:25-cv-1224-KCD-NPM, 2026 WL 672969 (M.D. Fla. Mar. 10, 2026).

9

But even if ICE's process was somehow lacking, Petitioner can hardly complain that he is being denied a meaningful opportunity to be heard *now*. Through this very habeas proceeding, he has had a full chance to review the Government's evidence, file his briefs, and press his legal arguments before an Article III court. He has had his say. Because this litigation itself has provided him with the exact procedural safeguards he claims to have missed, the Court declines to use the extraordinary tool of habeas relief to simply wipe the slate clean. "Because habeas is not backward-looking, the process provided now renders forward-looking relief separately inappropriate." *Ladak v. Noem*, No. 1:25-CV-194-H, 2025 WL 3764016, at *5 (N.D. Tex. Dec. 30, 2025).

**Count III—Accardi Doctrine**

Petitioner does not rely on the Constitution alone. He also brings a claim under the *Accardi* doctrine. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The premise of that doctrine is straightforward: "an agency must abide by its own regulations." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979). "[A]gency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the court." *Jean v. Nelson*, 727 F.2d 957, 976 (11th Cir. 1984). And it "goes without saying that ICE, like all government

10

agencies, must follow its own regulations." *Roble v. Bondi*, 803 F. Supp. 3d 766, 774 (D. Minn. 2025).

Petitioner claims that "8 C.F.R. § 212.12(h) provides grounds for revoking parole, supervised release or for justifying continued detention of Mariel Cubans pending their return to Cuba or a third country." (Doc. 1 at 31.) The Court cannot agree. *See Marquez-Coromina v. Hollingsworth*, 692 F. Supp. 2d 565, 571 (D. Md. 2010). Section 212.12 "addresses the procedure by which immigration parole may be granted or denied to Mariel Cubans; establishes the body responsible for making such decisions; sets forth the criteria and procedure for determining parole eligibility; and enumerates the circumstances in which immigration parole may be revoked." *Id.* Petitioner was granted parole upon his arrival in the United States, which was later revoked. "The regulation does not address continued detention after the removal order has been issued," as is the case here. *Id.*

Petitioner was released back in 2015 because his removal to Cuba was not reasonably foreseeable. That puts his case on a different regulatory track, one governed by 8 C.F.R. § 241.13. When the Government decides it is time to again detain someone on that specific path, it must follow the revocation procedures from § 241.13. *See Choy v. Woosley*, No. 4:25-CV-197-DJH, 2026 WL 324601, at *3 (W.D. Ky. Feb. 6, 2026). As noted above, the Court is satisfied these procedures were provided. But even if not, habeas relief is

11

unwarranted given the procedures Petitioner has been provided in this very proceeding. *See Ladak*, 2025 WL 3764016, at *5.

Petitioner also seemingly insists that the Government could not revoke his supervised release without some violation or noncompliance. That is simply wrong. The regulations do not require a rulebook infraction to haul someone back into custody. Under 8 C.F.R. § 241.13(i)(2), the government can revoke release based on changed circumstances alone—specifically, when there is a "significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* Playing by the rules is commendable, but it does not buy a noncitizen permanent immunity from a final, executable deportation order.

Finally, Petitioner complains that ICE "provided no meaningful opportunity to respond before revoking his supervision order and taking him into custody." (Doc. 1 at 3-4.) If he means ICE was required to provide process *before* putting him in handcuffs, he is misreading the rulebook. Section 241.13(i) does not mandate a pre-deprivation process. It allows the agency to revoke a release order and detain an individual based on changed circumstances without first convening a panel or holding a hearing. *See* 8 C.F.R. § 241.13(i)(3) ("The Service will conduct an initial informal interview promptly *after* his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the

12

notification." (emphasis added).) For all these reasons, the *Accardi* claim fails.

**Counts IV & V—No Authority to Detain**

In his final claims, Petitioner shifts focus from the process of his detention to the place of his detention. He takes aim at the facility where he was housed—Alligator Alcatraz—arguing that it operates outside the bounds of the law. (Doc. 1 at 31-32.)

We need not spend long here. Even if Petitioner is right, and Alligator Alcatraz is operating in clear violation of the law, that fact would not entitle him to the relief he wants—release from ICE custody. A challenge to the conditions of confinement does not suddenly invalidate the legal basis for that confinement. If a detention center is sub-par or operated unlawfully, the proper judicial remedy is to order the government to fix the facility or to transfer the detainee to one that passes muster. The Court declines to use a facility defect as an excuse to simply unlock the gates and let an individual with a final, executable removal order walk free.

### III. Conclusion

The habeas petition is **DENIED WITHOUT PREJUDICE** to Petitioner refiling a new case should his removal be unimpeded and he can show there is no significant likelihood of its execution in the reasonably foreseeable future. All other claims and relief are **DENIED**. The Clerk is

13

**DIRECTED** to enter judgment accordingly, terminate any pending motions and deadlines, and close the case.

**ORDERED** in Fort Myers, Florida on May 29, 2026.

Kyle C. Dudek
United States District Judge

14